STADLER ET AL., APPELLANTS, *v.* FIRST NATIONAL BANK OF HELENA ET AL., RESPONDENTS.

[No. 1,291.]

[Submitted January 10, 1899.   Decided February 20, 1899.]

*Negotiable Note—Attorney's Fee—Statutes—Construction—Set Off—Insolvency.*

1.   Civil Code, Sec. 3991, defines a "negotiable instrument" as a written promise or request to pay a certain sum to order or bearer, in conformity to the provisions of the article.    Section 3992 requires that it be payable in money only. and without any condition not certain of fulfillment.    Sections 3994 and 3996 provide that such an instrument may give the payee the option to pay the sum specified or perform another act, and may contain a pledge of collateral security.    Section 3997 provides that such instrument must not contain any other contract than as specified.    *Held*, that a note stipulating for payment of attorney's fees in case of suit is not negotiable.

2.   When the legislature borrows a statute from another state, the legislature will ordinarily be presumed to have adopted the statute with the interpretation theretofore given it by the courts of that state, which interpetration will be departed from only for the strongest reasons.

3.   Civil Code, Sections 2204, 4240, 4604, provide that, except where otherwise declared, the statutory provisions relating to the rights and obligations of parties to contracts are subordinate to the intention of the parties; that any one may waive the advantage of any law intended solely for his benefit; and that, when a contract is in writing, the intention is to be ascertained from it alone, subject, however, to the other provisions of the title.    *Held*, that a provision in a note that it is negotiable at a particular bank is not a waiver of the effect of a stipulation for payment of attorney's fees in case of suit, which, under other statutory provisions, renders the note nonnegotiable.

4.   Though a negotiable note is made negotiable and payable at a particular bank, it is still negotiable elsewhere.

5.   The rule that where a bank discounts a note payable to a third person, and negotiable in bank, the maker is estopped to set up set-offs against it, applies only to a note negotiable at the bank discounting it.

6. Civil Code, Sec. 1982, provides that the indorsee of a nonnegotiable written contract shall have all the rights of the assignor, subject to all equitiés existing in favor of the maker at time of the indorsement. Section 571, being part of the remedial law, and inserted under the subject of "Parties to Civil Actions," provides that an action by an assignee of a nonnegotiable thing in action is without prejudice to any set-off or other defense existing at the time of, or before notice of, the assignment. *Held*, that the latter section did not enlarge the former, so as to permit the set-off against the assignee of a demand against the assignor arising intermediate the indorsement and notice thereof.

7. Civil Code, Sec. 1982, makes an indorsee of a nonnegotiable contract subject to all equities existing at time of the indorsement. Sections 690, 691 and 692 provide that, in an action on an assigned contract, not a negotiable bill or note, a demand existing against the party thereto at the time of the assignment, and belonging to defendant in good faith, before notice of assignment, must be allowed as a counterclaim. *Held*, that a demand against the assignor could not be set off against the assignee, unless due and payable when the assignment was made, and that notice was unnecessary to prevent set-off of a demand becoming payable subsequently.

8. Where a debtor of a bank has deposits, the certificates of which have not yet matured, the fact that the bank is insolvent will not give the debtor the right to have such deposits set off against his debt.

9. "Insolvency" has two meanings. In its proper sense, it signifies that condition of a person whose entire assets are insufficient to pay his debts in full; in a restricted sense, however, the term is used to express the present inability of one to pay his current obligations as they mature, in the usual course of business. It is in this latter sense that the term is used when applied to banks.

10. The fact that if, at a particular time, a bank should close, its liabilities would exceed its assets, will not make due and payable, without demand, a deposit on open account, or one the certificate of which has matured, so as to give the depositor the right to set off such deposits against his debt to the bank, but the depositor has such right, in the absence of fraud, only in case of the declared insolvency of the bank.

*Appeal from District Court, Lewis and Clarke County; H. C. Smith, Judge.*

ACTION by Louis Stadler and another against the First National Bank of Helena and another. From the judgment of the court below plaintiffs appeal; and from a part thereof the First National Bank of Butte, defendant, appeals.    Modified.

Statement of the case by the Justice delivering the opinion.

This was a suit to obtain a decree setting off certain deposits made by the plaintiffs in the First National Bank of Helena, hereinafter called the "Helena bank," against the amount of a promissory note made by them as a firm to said bank, and transferred to the defendant, the First National Bank of Butte, hereinafter called the "Butte bank." The Butte bank set up a counterclaim for the amount of the note.    Trial was had by the court sitting with a jury.

It appears that Stadler & Kaufman is a co-partnership composed of Louis Stadler and Louis Kaufman. On July 18, 1896, Stadler & Kaufman, for value received, executed to the Helena bank a promissory note, of which the following is a copy:

"$6,000.00.        Helena, Montana, July 18th, 1896.

Sixty days after date, for value received, we, or either of us, promise to pay to the First National Bank of Helena, Montana, or order, Six Thousand Dollars, negotiable and payable at the First National Bank of Helena, Montana, with interest at the rate of 8 per cent. per annum from date until paid. The makers and indorsers hereby waive presentment, demand, protest, and notice of each and all thereof, and of nonpayment, and agree to pay reasonable attorney's fees in case of suit on this note.        Stadler & Kaufman."

When the note was made, Stadler & Kaufman had on deposit in the Helena bank, subject to check, the sum of $413.37. Kaufman individually had then on deposit in that bank $4,240, represented by a certificate of deposit dated January 8, 1896, by the terms of which the Helena bank promised to pay to his order said sum at 6 months after date, with interest at the rate of 5 per cent. per annum; Kaufman at that time had also on deposit in the Helena bank $5,000, for which the bank had issued its certificate of deposit of November 6, 1895, whereby it promised to pay to the order of Kaufman $5,000, 12 months after date, with interest at the rate of 6 per cent. per annum. On said July 18, 1896, Stadler had on deposit in the Helena bank $5,000, for which he held its certificate of deposit dated November 6, 1895, whereby the bank promised to pay to his order that sum 12 months after date, with interest at the rate of 6 per cent. per annum. On the day the note was made, July 18, 1896, the Helena bank, by its formal indorsement, transferred the $6,000 promissory note to the Butte bank, for which note the latter bank paid to the Helena bank the principal sum of the note. Ever since that time the Butte bank has been the owner and holder of the note, no part whereof has been paid. The Helena bank, on September 4, 1896, by

reason of its insolvency, closed its doors, suspended business, and was taken possession of by the Comptroller of the Currency, and since that day has been in charge of defendant receiver. Prior to September 8, 1896, plaintiffs had not been notified, nor were they aware, that their note had been transferred to the Butte bank. No demand for the payment of any of the deposits standing to the credit of plaintiffs, or to the credit of either of them, was made until after September 4, 1896. The facts just recited were practically admitted to exist. The court likewise so found, and also made substantially the following findings: That if the Helena bank had been closed, and its affairs liquidated and settled, on July 18, 1896, the amount that could have been realized from all its assets would have been less than its liabilities at that time; that the Helena bank at all times during the years 1895 and 1896, up to September 4th in the latter year, met and paid its obligations as they became due, in the ordinary course of business, but not from its own means from July 18 to September 4, 1896; that the Helena bank, at all times between July 18 and September 4, 1896, was unable to pay its debts from its own means as they became due; that, when a bank closes from any cause, the effect of closing is to bring about an immediate shrinkage and decrease of at least 25 to 50 per cent. of what would have been realized while a going bank; that the Butte bank bought the note in good faith, and without any knowledge of any equity, infirmity, or claim of plaintiffs, or either of them, to a right of set-off against the same; that the loan to plaintiffs upon the promissory note of $6,000 was not made by the Helena bank upon the credit of plaintiffs' deposits with the bank, nor upon any understanding or agreement that the same should be paid out of the proceeds of the certificates or any of them; that, at the time the $6,000 note was executed, the firm of Stadler & Kaufman had the three several certificates of deposit with them, and offered to leave the same with the bank as collateral security for the note, but the manager of the bank told them it was not necessary, and they were not left; that on July 18, 1896, at the time the note was signed,

Stadler informed the manager of the Helena bank that, if his firm did not sell enough cattle in 60 days to pay the note, they would pay it when their certificates of deposit became due, and the manager replied that it was all right, and that it was after such suggestion of Stadler and remark of the manager that Stadler offered to pledge the certificates of deposit as security for the note, which offer the manager declined, upon the ground that it was not necessary, as the bank did not want any security from Stadler & Kaufman; that plaintiffs had no notice of the insolvent condition of the Helena bank until September 4, 1896; and that $500 is a reasonable counsel fee for suit upon the note.

As conclusions of law, the court declared that the $6,000 note is nonnegotiable; that plaintiffs, as co-partners, are entitled to a counterclaim for the sum of $413.37, the balance due them on their open account with the Helena bank; that the plaintiffs are not entitled to a set-off or counterclaim, or other defense, either legal or equitable, on account of the certificates of deposit mentioned; and that the Butte bank is entitled to judgment upon the $6,000 note, with interest and costs, and $500 attorney's fees, deducting therefrom the $413.37 allowed as a counterclaim. Judgment was entered accordingly. Plaintiffs appeal from the whole judgment, and the Butte bank appeals from so much of the judgment as allows a set-off of $413.37 against the $6,000 note. These appeals have been heard as one.

*Cullen, Day & Cullen,* for Appellants.

The note held by the First National Bank of Butte, being non-negotiable, the bank held the same subject to the provisions of Section 1982 of the Civil Code, and Section 571 of the Code of Civil Procedure.

These sections are to be found in the Civil Code of California in exactly the same language and are therefore to be taken subject to the construction put upon them by the Supreme Court of that state prior to their incorporation in our

code. That court, on February 8th, 1894, held that the provisions of the Code of Civil Procedure operated as an enlargement of the provisions of the Civil Code and that a party might avail himself of any set-off or defense which he might have against a nonnegotiable instrument existing at the time of notice of assignment. In other words, the assignment of a nonnegotiable instrument is not complete so as to cut off equities or defenses until notice is given to the makers. (*St. Louis National Bank* v. *Gray*, 101 Cal. 290, 35 Pac. 876.) And this was the rule at common law. (2 Am. and Eng. Ency. Law (2nd Ed.) 1077; *Baker* v. *Wood*, 157 U. S. 212.)

The right to a set-off in equity exists, independently of statute, and is controlled only by general principles of equity. (Bliss on Code Pleading, Sec. 383; 2 Story's Equity, Secs. 1435-7; *Blake* v. *Langdon*, 19 Vt. 485; *Tribble* v. *Taul*, 7 Monr. 456; *Jeffries* v. *Evans*, 6 B. Mon. 119; *Smith* v. *Felton*, 43 N. Y. 419; *Richardson* v. *Doty*, (Neb.) 62 N. W. 254.) The insolvency of a payee of a promissory note is a sufficient ground for invoking the aid of equity to allow a set-off in cases not provided for by law. (Waterman on Set-Offs, 431-432; *Kentucky Flour Co.* v. *Merchants Natl. Bank*, 90 Ky. 225; *Carr* v. *Hamilton*, 129 U. S. 252; *Rolling Mill Co.* v. *Ore and Steel Co.*, 152 U. S. 616; *Scott* v. *Armstrong*, 146 U. S. 507-8; *Leybourn* v. *Seymour*, 53 Minn. 105; *St. Paul & Minn. Trust Co.* v. *Leck*, 57 Minn. 87; 47 Am. St. Rep. 576 and note.) The insolvency of the party against whom the set-off is claimed is sufficient ground for the exercise of the jurisdiction of a court of equity. (*Russell* v. *Conway*, 11 Cal. 93.) The jurisdiction of a court of equity in relation to set-offs is more extensive than at common law, and where the real parties are insolvent equity will decree a set-off in cases not within the statutory terms. (*Howard* v. *Shores*, 20 Cal. 278; *Hobbs* v. *Duff*, *Id.* 596, 627; *Rothschild* v. *Mack*, 115 N. Y. 1, 21 N. E. 726.) Especially is this true where there are mutual dealings between the parties out of which the credit arises. (*Mercer* v. *Dyer*, 15 Mont. 317; *Carr* v. *Hamilton*, 129 U. S. 252; *Scott* v. *Armstrong*, 146 U. S. 499.)

When these mutual dealings result in mutual credits or positive agreements, an equity is created of which the party cannot be deprived, except by the transfer of a negotiable instrument before maturity to a *bona fide* purchaser for value without notice. (Story on Equity Jurisprudence, Sec. 1435; *Scott v. Armstrong*, 146 U. S. 508; *Meyers* v. *Davis*, 22 N. Y. 489; *Munger* v. *Albany City Nat'l Bank*, 85 N. Y. 580; *Fuller* v. *Steiglitz*, 27 O. St. 355; *Mercer* v. *Dyer*, 15 Mont. 317.)

The rule in England seems to be the same as it is in this country. In the case of *Lord Lanesborough* v. *Jones*, 1 p. Will, 326, Lord Chancellor Cooper said: "That it was natural justice and equity that in all cases of mutual credit only the balance should be paid." And in *Jeff* v. *Wood*, 2 p. Will, 129, the Master of the Rolls, in speaking of an arrangement similar in some respects to the one in the case at bar, said: "However, it seems that the least evidence of an agreement for a stoppage will do. And in these cases equity will take hold of a very slight thing to do both parties right." So, too, the fact that the debts are not due in the same right will not prevent the allowance of set-off in equity in cases of insolvency of the joint creditors, or where other grounds of equitable interference exist. (*Kemp* v. *McCormick*, 1 Mont. 420; *Collier* v. *Ervin*, 3 Mont. 142; *Lindsay* v. *Jackson*, 2 Paige, 581; *Becker* v. *Northway*, 20 Am. St. Rep. 545; *Cosgrove* v. *Crosby*, 86 Ind. 511; *Second Nat'l Bank* v. *Hemingray*, 34 O. S. 381; *McDonald* v. *MacKenzie*, (Ore.) 14 Pac. 866; *Brewer* v. *Norcross*, 17 N. J. Eq. 219; *Raleigh* v. *Raleigh*, 35 Ill. 512; *Baker* v. *Kinsey*, 41 O. S. 403; *Robinson* v. *Furbush*, 34 Me. 509; *Ashley* v. *Willard*, (Vt.) 2 Tyler 391; *Kent* v. *Rogers*, 24 Mo. 306; *Austin* v. *Feland*, 8 Mo. 309; *Leach* v. *Lambeth*, 14 Ark. 658; *Burke* v. *Stilwell*, 23 Ark. 294; *Dunn* v. *West*, 5 B. Mon. 376; *Powell* v. *Hogue*, 8 B. Mon. 443; *Briggs* v. *Vose*, 20 Barb. 477; *Newell* v. *Salmons*, 22 *Id.* 647; *Stewart* v. *Coulter*, 12 Serg. & R. 252.)

Counsel for defendants contended in the court below that plaintiffs were entitled to the set-off claimed, for the reason that the indebtedness sought to be set-off was not mature,

while the note in controversy was in the hands of the First National bank of Helena and that under the provisions of Section 692, Code of Civil Procedure, the set-off must have existed in a perfect form at the time of the assignment. To this we answer that in so far as the complainant seeks to set-off the amount of deposit subject to check, the indebtedness was matured at that time, and no demand therefor was necessary. So, too, the certificate for $4,240, No. 71,254, was then due and payable (Rec. p. 29.) While a demand might have been necessary for the purpose of a suit, none was necessary to make these available for use as a set-off. (*Richards* v. *LaTourette*, 119 N. Y. 54, 23 N. E. 531; *Hughitt* v. *Hayes*, 136 N. Y. 163, 32 N. E. 706; *Seymour* v. *Dunham*, 24 Hun. 91.) At the time notice of the assignment was given, these certificates had all been matured by the suspension of the bank. (*Mercer* v. *Dyer*, 15 Mont. 317; *Davis* v. *Industrial Co.*, 114 N. C. 321; *Yardley* v. *Clothier*, 49 Fed. 337; *Barnes* v. *Arnold*, 51 N. Y. S. 1109.) The fact that all of the several debts were not due on July 18, 1896, does not deprive equity of jurisdiction to decree set-off. The authorities are agreed that it is sufficient if the indebtedness from the insolvent is due at the time of the assignment. The debt owing to him need not be then due, for the reason that his creditors can waive the time as to that. (*Richards* v. *LaTourette*, 119 N. Y. 54, 23 N. E. 531; *Armstrong* v. *Warner*, 49 O. S. 376; *Rothschild* v. *Mack*, 115 N. Y. 1, 21 N. E. 726.)

The case of *Fera* v. *Wickham*, 135 N. Y. 223, 31 N. E. 1028, is the latest expression of that court upon the subject, and an examination of that case shows that the decision is expressly based upon the absence of any particular or, as it is termed, superior equity, such as would take the case out of the operation of the statutory provisions. But the reasoning of the case is far from satisfactory and the Supreme Court of Minnesota, in the case of *St. Paul & Minn. Trust Co.* v. *Leck*, 57 Minn. 87, not only criticised the reasoning but refused to follow the decision in a case where there were no equities shown, except that arising from the insolvency. And

the New York court, in the case of *Hughitt* v. *Hayes*, 136 N. Y. 163, 32 N. E. 706, recognizes and emphasizes this distinction.

*William Wallace, Jr., Carpenter & Carpenter*, for Respondents.

The $6,000 promissory note is a negotiable instrument. Prior to the adoption of the Civil Code such a promissory note was unquestionably a negotiable instrument in Montana at common law. (*Bank* v. *Fuqua*, 11 Mont. 285; *Farmers Bank* v. *Sutton*, 3 C. C. A. 1 (52 Fed. 191); *Farmers Bank* v. *Sutton*, 17 L. R. A. 595; 1 Randolph on Com. Paper, Secs. 205 and 206; *Hotchkiss* v. *Nat. Bank*, 21 Wall. 357; *Been* v. *Kutzhan*, 32 Pac. 763; *Bank* v. *Anglin*, 33 Pac. 1056; *Bank* v. *March*, 56 N. W. 458.) Under Sections 3991, 3992, 3997, 4240, 4604, 2204 of the Civil Code, the provision for the payment of reasonable attorney's fees in case of suit on this note does not destroy its negotiability. The agreement to make it a negotiable instrument waives and destroys all right to set off that might possibly exist in the case of the transfer of a non-negotiable instrument. (Civil Code, Secs. 4240 and 4604; 1 Daniel on Neg. Instruments, Secs. 106, 107 and 116; Edwards on Bills, (Ed. 1857) 164; 1 Randolph on Com. Paper, Sec. 177; *Raymond* v. *Middleton*, 29 Pa. St. 530; *U. S.* v. *White*, 2 Hill 59; *Mandeville* v. *Union Bank*, 9 Cranch 9; *Emanuel* v. *Atwood*, 6 Porter (Ala.) 384; same case, Smith's Condensed Reports, 4 Ala. 524.)

In Field's proposed New York Civil Code, in a note to Sec. 1719, which has been adopted in California and Montana, the author says: "It has been said that an instrument cannot be made negotiable by calling it so on its face. (*Carruth* v. *Walker*, 8 Cal. 252.) But it may be worthy of consideration whether parties should not be allowed by express words to bring any contract within the rules of negotiable paper." The case of Carruth v. Walker is not found at 8 Cal. 252 and is at 8 Wisconsin 252, and simply holds that a nonnegotiable note is not made negotiable as against the maker by the in-

dorser writing ''payable to order'' across the back, although as between payee and subsequent indorsee it is negotiable. Under Section 4240 the agreement that the note should be negotiable is a waiver of any benefit to the maker on account of equities existing between him and the payee, after the note passes before maturity to an innocent holder. The rule is general that a person may waive the benefit of a statutory or even a constitutional provision operating to his benefit. (Civil Code, Sec. 4604.) The waiver of the right to a set-off is not against the public policy of Montana, for prior to the adoption of its Civil Code, a promissory note providing for attorney's fees was held to be a negotiable instrument according to common law. It can be no more against public policy than the waiver of presentment, protest or notice of nonpayment. The California decision to the effect that a provision for the payment of attorneys fees in case of action upon the note, destroys its negotiability do not appear to have been made in reference to any promissory note similar to the one under consideration. The California statute as to negotiable instruments, was copied verbatim from Field's Proposed Civil Code of New York, and understood only to declare the common law on that subject. The decisions of the California courts upon statutes which are only declaratory of the common law should have no more weight in Montana than the decision of any other state upon a common law question.

In adopting the California statute, Montana only codified and declared the common law as to negotiable instruments, which law had already been declared in the case of *Bank* v. *Fuqua*, 11 Mont. 285. In such a case the decisions of California will not be permitted to override the settled law of Montana. In any case a statute adopted from another state will be given the construction put upon it in the parent state before its adoption, only when such construction is reasonable. (Endlich on Statutes, Sec. 371; *Van Doren* v. *Tjader*, 1 Nev. 394 or 333; *Milliken* v. *Sloat*, 1 Nev. 580; *Davis* v. *Robinson*, 11 La. Ann. 752; *Hunter* v. *Truckee Lodge*, 14 Nev. 24-32; *Ingraham* v. *Regan*, 23 Miss. 213; *Largey* v. *Chap-*

*man,* 18 Mont. 567.) In some states it has been held that while the note providing for the payment of attorneys fees is negotiable, the stipulation is void. (*Garr* v. *Louisville Bk. Co.,* 11 Bush. 182; *Witherspoon* v. *Mussleman,* 14 Bush. 214; *Bullock* v. *Taylor,* 39 Mich. 138; *Meyer* v. *Hart,* 40 Mich. 517; *Weight* v. *Travers,* 73 Mich. 494.)

In the case of *Second Nat. Bank* v. *Basuier,* 12 C. C. A. 517 (65 Fed. 58) the Circuit Court of Appeals for the Eighth Circuit held that a promissory note "negotiable and payable with exchange and costs of collection" was nonnegotiable. The decision was, however, principally based upon the ground that the Dakota courts had held such an instrument to be nonnegotiable at common law, and the point was not made that the use of the word "negotiable" in the note made the instrument negotiable. The provision for the payment of the note with exchange renders uncertain the amount to be paid, while the provision for attorneys fees adds no uncertainty to the amount to be paid when the note becomes due, and only attaches to the remedy in case the note is not paid at maturity. (*Nicely* v. *Winnebago Bank,* 47 N. E. 476.)

**PIGOTT, J.—1.** The Butte bank acquired the $6,000 note of Stadler & Kaufman by indorsement, in the ordinary course of business, in good faith, for value, and before maturity; hence it is apparent that, if the note be commercial paper, the Butte bank acquired an absolute title thereto, notwithstanding any defect in the title of the Helena bank (Civil Code, Secs. 4034, 4035); that is to say, the Butte bank took it free of, and discharged from, any defense, legal or equitable, which existed as between the makers and the payee, and therefore the Butte bank would be entitled to a judgment for the full amount thereof, without reduction by reason of any set-off claimed by plaintiffs.

The contention of defendants is that the note is negotiable, while plaintiffs insist that the agreement therein contained to pay attorney's fees in case of suit destroys the quality of negotiability otherwise possessed by it. It has been a much-

debated question whether such a promise is fatal to negotiability, and the Courts are pretty evenly divided upon the subject. In this State, however, the matter was set at rest by the case of *Bank of Commerce* v. *Fuqua*, 11 Mont. 285, 28 Pac. 291; the Supreme Court holding that an agreement like the one in the note of July 18th had no effect upon the negotiability of a bill of exchange; and such was the law in Montana, and such is now the rule of decision, unless the Civil Code, which became operative on July 1, 1895, worked a change. We think it did. Section 3991 of that Code defines a "negotiable instrument" as "a written promise or request for the payment of a certain sum of money to order or bearer, in conformity to the provisions of this article." By Section 3992, it "must be payable in money only, and without any condition not certain of fulfillment." By Sections 3994 and 3996, the declaration is made that a negotiable instrument may give to the payee an option between the payment of the sum specified therein and the performance of another act; and that it may contain a pledge of collateral security, with authority to dispose thereof. Section 3997 is as follows: "A negotiable instrument must not contain any other contract than such as is specified in this article."

The note in the case at bar contains a promise to pay the sum of $6,000; it contains, also, another contract, to wit: an agreement to pay reasonable attorney's fees in case of suit on the note, in violation of the mandatory and prohibitive language of Sections 3992 and 3997. It contains a condition not certain of fulfillment, and also a contract to pay a sum of money, other than the $6,000, if that condition should be fulfilled. We are satisfied that the note is a nonnegotiable instrument, when the plain words and clear intent of the sections quoted are are applied to its terms; nor is there want of direct authority for these views. The sections referred to were borrowed, word for word, from either the Civil Code of California or that of North or South Dakota—probably from that of California, whence we have adopted a large part of our statute law. The Supreme Court of California interpreted

the provisions mentioned in *Adams* v. *Seaman*, 82 Cal. 636, 23 Pac. 53, decided January 29, 1890, and said: ''These code provisions were evidently intended to remove, and they do remove, all doubt which conflicting judicial decisions had thrown over such questions as the one arising in the case at bar. Under them, an instrument is not negotiable if it have 'any condition not certain of fulfillment.' In the case at bar the instrument, in addition to the main sum, which is to be paid absolutely, provides for another sum to be paid, not only upon the contingency of a suit being brought, but also upon the other condition of the employment of an attorney. * * * An attorney's fee, no matter how estimated, was not to be paid unless 'suit be commenced or an attorney employed,' each being a 'condition not certain of fulfillment.' We think, therefore, that the instrument sued on was not, in the sense of current commercial paper, a negotiable promissory note.'' Among the subsequent cases approving Adams v. Seaman may be cited *Bank* v. *Babcock*, 94 Cal. 96, 29 Pac. 415. In *Garretson* v. *Purdy*, 3 Dak. 178, 14 N. W. 100, decided November 13, 1882, the Supreme Court of Dakota announced the same doctrine. The Supreme Court of North Dakota, in *First National Bank* v. *Laughlin*, 4 N. D. 391, 61 N. W. 473, decided December 10, 1894, held to the same rule. The United States Circuit Court of Appeals for the Eighth Circuit, on December 3, 1894, in the case of *Second National Bank* v. *Basuier*, 12 C. C. A. 517, 65 Fed. 58, applied the same rule. In that case the notes, otherwise negotiable, contained a clause for the payment of exchange and costs of collection. After quoting the sections of the Compiled Laws of Dakota, of which the sections of our Civil Code referred to are copies, the Court say: ''It will be observed that the statute not only prohibits the insertion 'of any condition not certain of fulfillment' in a note or bill which is intended to be negotiable, but it further declares, in substance, that a note or bill 'must not contain any other contract' than a promise or request for the payment of a certain sum of money to order or bearer. Now, undoubtedly, the notes in suit, when fairly construed, do contain

an agreement on the part of the makers that, if any costs are incurred by the holder in the collection of the paper, they will pay such costs, whatever the same may be, in addition to the principal sum expressed on the face of the notes, and to this extent they contain a condition which the makers may or may not be called upon to fulfill, depending upon circumstances. * * * The foregoing interpretation of the phrase, 'with costs of collection,' which seems to us to be a reasonable and natural interpretation, brings the several notes in suit within the inhibitions of the Dakota statute, and will not permit them to be classified as negotiable instruments, according to the rule prescribed by the statute." The Supreme Court of South Dakota has likewise decided that a note, otherwise negotiable, but containing a promise to pay interest at the rate of 10 per cent. per annum unless the principal sum be paid when due, in which event 8 per cent. per annum only should be paid, is not negotiable, because the amount which might be demanded thereon was not certain. (*Hegeler* v. *Comstock*, 1 S. D. 138, 45 N. W. 331.) This case was decided May 12, 1890. When a particular statute has been adopted by this State from the statutes of another, after a judicial interpretation (suited to our condition) has been placed upon it by the parent state, the courts of this State are bound by the interpretation of the courts of the state whence it was adopted, or will, at least, accord respectful consideration to such interpretation, and depart from it only for strong reasons, as was held in *Oleson* v. *Wilson*, 20 Mont. 544, 52 Pac. 372; in other words, when a legislature borrows a statute from another state, the legislature will ordinarily be presumed to have adopted the statute with the interpretation theretofore given it by the courts of that state. (*First Nat. Bank* v. *Bell S. & C. Min. Co.*, 8 Mont. 32, 19 Pac. 403; *Territory* v. *Stears*, 2 Mont. 324; *Lindley* v. *Davis*, 6 Mont. 453, 13 Pac. 118; *Stackpole* v. *Hallahan*, 16 Mont. 40, 40 Pac. 80; *Murray* v. *Heinze*, 17 Mont. 353, 42 Pac. 1057, and 43 Pac. 714; *State* v. *O'Brien*, 18 Mont. 1, 43 Pac. 1091, and 44 Pac. 399; *State ex rel. Milsted* v. *Butte City Water Co.*, 18 Mont. 199, 44 Pac. 966; *Largey* v. *Chapman*, 18 Mont. 563, 46 Pac. 806.)

Defendants lay great stress upon the words, "negotiable and payable at the First National Bank of Helena," appearing in the note, and argue that, if it be conceded that the negotiability of a promissory note in the ordinary form would be destroyed by the provision regarding attorney's fees, nevertheless that provision has no such effect in the case of a note which contains an agreement that it shall be a negotiable instrument; and they invoke Sections 4240, 4604 and 2204 of the Civil Code, which are as follows:

"Sec. 4240. Except where it is otherwise declared, the provisions of the last foregoing fifteen titles of this part, in respect to the rights and obligations of parties to contracts, are subordinate to the intention of the parties, when ascertained in the manner prescribed by the chapter on interpretation of contracts; and the benefit thereof may be waived by any party entitled thereto, unless such waiver would be against public policy."

"Sec. 4604. Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."

"Sec. 2204. When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible, subject, however, to the other provisions of this title."

They contend that, under these sections, the provision for the payment of reasonable attorney's fees, in case of suit on the note, does not destroy its negotiability. Counsel assert that in this note is an agreement by the parties that it shall be negotiable notwithstanding the provision for attorney's fees, and therefore, by virtue of Sections 4240 and 4604, the provisions of Sections 3991, 3992 and 3997 are subordinated to the intention of the parties as expressed in, and ascertained by, the note itself, and that such an agreement is a waiver in favor of the indorsee of any benefit to the makers on account of equities existing between them and the payee; in short, that the phrase "negotiable and payable at the First National Bank," is a contract to waive, and is a waiver of, the effect

of the stipulation for attorney's fees upon the negotiability of the note.  We are unable to adopt the views of counsel.  Conceding that the absence of the words "order" or "bearer," which are the usual badges of negotiability at common law as well as under the Civil Code, may be supplied by the declaration that the instrument is negotiable, yet it does not follow that counsel's position is tenable.  Without the stipulation for the payment of attorney's fees, the note would be negotiable.  Its character in that respect would not be affected by the superadded phrase "negotiable and payable" at the Helena bank, for it would still be negotiable elsewhere.  (*Wardell* v. *Hughes*, 3 Wend. 418.)  The intention to make a negotiable instrument was as much manifested by the promise "to pay to the order of," as by the words "negotiable at," the Helena bank.  Repetition of the promise to pay to the order of the bank could not increase the negotiability of the paper, nor evince the purpose to waive the effect of the statutory requirement that an instrument, to be negotiable, must be free from any condition not certain of fulfillment, and free also from any contract other than such as is specified in the sections defining negotiable instruments.  The word "negotiable" has no greater significance than have the terms usually employed to communicate the quality of negotiability, and thereby to distinguish commercial paper from other written promises or requests to pay money at all events, which are nonnegotiable because they omit "order" or "bearer."  We recognize the just rule laid down in *Mandeville* v. *Union Bank of Georgetown*, 9 Cranch, 9, that the bank which becomes the indorsee of and discounts a nonnegotiable note made to a third person, containing the declaration that it is negotiable at the bank which discounts it, takes the instrument discharged of any setoff between the maker and payee.  This rule is based upon the doctrine of estoppel, for the Court, through Mr. Chief Justice Marshall, held that whether the note was negotiable or not was entirely immaterial, and said:  "By making a note negotiable in bank, the maker authorizes the bank to advance on his credit to the owner of the note the sum expressed on

its face. It would be a fraud on the bank to set up offsets against this note in consequence of any transaction between the parties. These offsets are waived, and cannot, after the note has been discounted, be again set up.'' Here the facts are different, as the note is declared negotiable, not at the Butte bank, but at the payee bank, and the principle which governed in the case cited is inapplicable.

2. The note is nonnegotiable. It therefore becomes necessary to inquire into the title obtained thereto by the Butte bank, and for that purpose convenience may be attained by regarding the action as one brought by the Butte bank upon the $6,000 note, in which Stadler and Kaufman, as a co-partnership and as individual persons, claim the right to set off deposits to their credit in the Helena bank. The Butte bank took the note subject to the provisions of Section 1982 of the Civil Code, and of Sections 571, 690–692 and 698 of the Code of Civil Procedure. Section 1982 provides that ''a nonnegotiable written contract for the payment of money or personal property may be transferred by endorsement in like manner with negotiable instruments. Such endorsement shall transfer all the rights of the assignor under the instrument to the assignee, subject to all equities and defenses existing in favor of the maker at the time of the endorsement.'' Section 571 provides, in substance, that an action by the assignee of a nonnegotiable thing in action ''is without prejudice to any set-off or other defense existing at the time of, or before, notice of the assignment.'' By Section 690, the defendant may plead a counterclaim, which, by Section 691, ''must tend, in some way, to diminish or defeat the plaintiff's recovery, and must be one of the following causes of action against the plaintiff, or, in a proper case, against the person whom he represents, and in favor of the defendant, or of one or more defendants, between whom and the plaintiff a separate judgment may be had in the action: * * * (2) In an action on contract, any other cause of action on contract, existing at the commencement of the action.'' So much of Section 692 as is pertinent reads: ''But the counterclaim specified in subdi-

vision two of the last section is subject to the following rules:
(1)   If the action is founded upon a contract, which has been
assigned by the party thereto, other than a negotiable promis-
sory note or bill of exchange, a demand, existing against the
party thereto, or an assignee of the contract, at the time of
the assignment thereof, and belonging to the defendant in good
faith, before notice of the assignment, must be allowed as a
counterclaim to the amount of the plaintiff's demand, if it
might have been so allowed against the party, or the assignee,
while the contract belonged to him.''     Section 698 is as fol-
lows:   ''When cross-demands have existed between persons
under such circumstances that, if one had brought an action
against the other, a counterclaim could have been set up, the
two demands shall· be deemed compensated, so far as they
equal each other, and neither can be deprived of the benefit
thereof by the assignment or death of the other.''

The first position taken by plaintiffs is that a defendant who
is sued by the assignee of a nonnegotiable chose in action may,
in virtue of Section 571, interpose as defense, by way of set-
off, a demand held by him against the assignor, and which
came into existence after the making, and before notice to de-
fendant, of the assignment,—in other words, that until notice
is given to him such assignment is not complete so as to pre-
vent defendant, when sued by the assignee, from asserting, as
set-off against the assigned claim, a demand against the as-
signor which arose subsequently to the date of the transfer.

As has been stated, when the note was transferred to the
Butte bank, Stadler & Kaufman had on deposit in the Helena
bank subject to check $413.37, and Kaufman had on deposit
in the same bank $4,240, which was payable on and after
July 8, 1896, upon presentation of the certificate; Stadler and
Kaufman each had then on deposit in that bank $5,000, pay-
able on and after November 6, 1896, upon presentation of the
certificate representing the same.     Plaintiffs argue that since
notice of the assignment of the note was not given until Sep-
tember 8, 1896, which was after the Helena bank had sus-
pended payment and had been taken charge of by the Comp-

troller, the Butte bank took the note subject to all rights of set-off existing in favor of plaintiffs and against the Helena bank on September 8, 1896; and that since the effect of the declared insolvency of the Helena bank was to cause debts owing by it, and for want of demand not otherwise due, to become due and actionable instantly, the equitable right to set off the deposits was perfect on September 4th, when the bank closed its doors. They urge that the last sentence of Section 1982 of the Civil Code, declaring that the indorsement of a nonnegotiable contract shall transfer to the assignee the rights of the assignor subject to all equities and defenses existing in favor of the maker at the time of the indorsement, is enlarged, by the provisions of Section 571 of the Code of Civil Procedure, so as to permit the assertion as a set-off of a demand against the assignor arising intermediate the indorsement and notice thereof.

We are unable to agree with the foregoing interpretation of Sections 1982 and 571. The former makes general provision that the indorsement shall transfer all the rights of the assignor, subject to such equities and defenses as may exist in favor of the maker at the time of the indorsement; but it does not define or specify the equities and defenses which may be availed of by the maker of the contract. This section is found in that portion of the statutes treating of substantive law. Section 571 is part of the Practice Act, the chief purpose of which is to indicate the means whereby the rights created, declared and limited in the Civil Code and elsewhere are to be enforced, and to prescribe the modes of procedure thought best adapted to accomplish the attainment of the end desired, —the protection of those rights. Were there a mere verbal conflict between these sections, no reason occurs to us why Section 571,—which, as we shall see, does not profess to establish new rights, but only to declare the application of an old principle to new conditions,—should control or enlarge the effect of Section 1982. But, in either the interpretation or construction of statutes, consideration of the general scope and purpose of a particular code becomes important only as an

aid in the effort to ascertain the true intent and meaning of a statute contained in it; hence if, because of substantial inconsistencies between them, or for any reason, it should appear that Section 571 was intended to enlarge or restrict, in respect of set-off, the effect of Section 1982, the courts would be bound so to declare.

The sections are not in conflict, nor does one in any wise limit the operation of, or expand, the other.   Section 571 is found in the chapter devoted to the subject ''Parties to Civil Actions,'' and immediately succeeds the provision of Section 570, to the effect that every action must be prosecuted in the name of the real party in interest.   Now, at the common law, the assignee of a nonnegotiable contract could not maintain an action thereon in his own name, but only in the name of the assignor.   The change in this respect brought about by Section 570 was the reason for the enactment of Section 571.   In Section 571, as in Section 1982, no attempt is made to define ''set-off;'' the question as to what a set-off is and when it accrues are left to be answered by reference to, and the application of, other statutes and laws.   It does not change the substantial rights of the parties, but, in the language of the opinion in *Beckwith* v. *Bank*, 9 N. Y. 211: ''Section 112 was intended only to introduce such alterations in the mode of protecting them as were rendered necessary by the provisions of Sections 111 and 113, which require in most cases the real party in interest to be the plaintiff.   The first branch of the section will have its full and appropriate meaning if we regard it as providing that, 'in the case of an assignment of a thing in action, the action by the assignee shall be without prejudice to any set-off or other defense existing at the time of, or before notice of, the assignment,' which would have been available to the defendant had the action been brought in the name of the assignor.   In other words, the provision is that the substantial rights of the defendant shall not be affected by the substitution of the assignee as plaintiff in place of the assignor.''   Section 112 of the Code of New York of 1849, referred to in the quotation, is identical with Section

571, *supra*, and Sections 111 and 113 are similar to Section 570, *supra*. To the same effect is *Myers* v. *Davis* (1860), 22 N. Y. 489, where the Court said: "The alteration of the practice allowing the beneficial owner of a chose in action, not negotiable at law, to sue thereon in his own name, does not change the actual rights of the parties to any assignment of it. The defendants in this action are therefore entitled to the same defense which they would have had if the former rule had continued to prevail, and this action had been brought in the name of Watrous and Lawrence (assignors), and to no other or different defense. The assignee would have been protected in his equitable rights, notwithstanding the nonnegotiable nature of the contract, to the same extent that he is entitled to have them protected now that he can prosecute in his own name. The change effected by the Code is simply as to the form in which the action is to be carried on." *Martin* v. *Kunzmuller* (1867), 37 N. Y. 396, and a multitude of other decisions, have been rendered in approval of the foregoing interpretation, which we deem unnecessary to cite, for this construction is now firmly established. In Pomeroy's Code Remedies, at Section 156, it is said that this construction is now universally, as well as firmly, established. That it is firmly established is apparent, but that it is universal is not strictly accurate; for the Supreme Court of California in *McCabe* v. *Grey*, 20 Cal. 509, and in *Bank* v. *Gay*, 101 Cal. 290, 35 Pac. 876, and the Supreme Court of Arizona in *Martin* v. *Wells*, 28 Pac. 598, and perhaps other courts, seem to have entertained a contrary view of the meaning of sections identical with Section 571.

We must therefore turn to other provisions of the law in order to ascertain what a set-off is and when it may be allowed as against the assignee of a contract. "Set-off" *ex vi termini* implies reciprocal demands existing between the same persons at the same time, as is substantially expressed in Section 698, *supra*. By Section 1982, the indorsement of a contract not negotiable transfers to the assignee the title of the assignor, subject to all equities and defenses existing in favor of the

maker of the contract at the time of the indorsement, and the design of the provision is explained and its effect defined, as to set-off, by Section 692, which treats particularly of and is devoted to counterclaims, including set-offs. Subdivision 1 of Section 692 is, in substance, Subdivision 8 of Section 18, at page 366, of the Revised Statutes of New York of 1867, in force in that State ever since the year 1847, and perhaps from an earlier date. Said subdivision 1 is a copy of subdivision 1 of Section 502 of Throop's Annotated Code of Civil Procedure of New York of 1888, and is also identical with subdivision 1 of Section 502 of Stover's New York Annotated Code of Civil Procedure of 1897. The Courts of New York are practically unanimous in holding that, while notice of assignment is required to cut off other defenses in favor of the defendant and against the assignor, it is not necessary with respect to set-off, either at law or in equity; that a demand against the assignor, to be a set-off at law, must exist in the form of a debt due and payable from the assignor at the date of the transfer, and that a debt owing by the assignor, not then due and actionable, but which becomes so prior to notice of the transfer, is not a legal set-off; and that, to be available against the assignee, the equitable right to a set-off must attach at the time of the transfer and cannot arise afterwards. (*Watt* v. *Mayor, etc.,* (1847) 1 Sandf. 23; *Wells* v. *Stewart,* (1848) 3 Barb. 40; *Bradley* v. *Angel,* (1850) 3 N. Y. 475; *Beckwith* v. *Union Bank,* (1851) 4 Sandf. 604, and *ubi supra*; *Myer* v. *Davis,* (1860) *supra*; *Martin* v. *Kunzmuller,* (1867) *supra*; *Perry* v. *Chester* (1873) 53 N. Y. 240; *Taylor* v. *Mayor, etc.,* (1880) 82 N. Y. 11; *Munger* v. *Albany City National Bank,* (1881) 85 N. Y. 580; *Fera* v. *Wickham,* (1892) 135 N. Y. 223, 31 N. E. 1028; see also, *Harrisburg Trust Co.* v. *Shufeldt,* 31 C. C. A. 190, 87 Fed. 669.) The Supreme Courts of Missouri, Wisconsin and Ohio, in *Huse* v. *Ames,* 104 Mo. 91, 15 S. W. 965; *Kinsey* v. *Ring,* 83 Wis. 536, 53 N. W. 842 and *Fuller* v. *Steiglitz,* 27 Ohio St. 355, and other courts, adhere to the same doctrine. Upon this subject Mr. Pomeroy, in Section 163 of his work on Code Remedies, says:

"'The assignee takes the demand assigned subject to all the rights which the debtor had acquired prior to the assignment, or prior to the time when notice was given, if there was an interval between the execution of the transfer and the notice; but he cannot be prejudiced by any new dealings between the original parties after notice of the assignment has been given to the debtor. When two opposing debts exist in a perfect condition at the same time, either party may insist upon a set-off. If, therefore, the holder of such a claim, already due and payable, assign the same and the debtor, at the time of the transfer, holds a similar claim against the assignor, which is also then due and payable, he may set off his debt against the demand in the hands of the assignee. If, however, the assignment is made before the opposing demand becomes mature and the latter does not thus become actually due and payable until after the transfer, the debtor's right of set-off is destroyed by the mere fact of the assignment, and no notice thereof to him is necessary to produce that effect. The following special rule also exists under the peculiar circumstances mentioned: If an insolvent holder of a claim not yet matured assigns the same before maturity and the debtor, at the time of this transfer, holds a similar claim against the assignor, which is then due and payable, his right of set-off against the assignee, when the latter's cause of action arises, is preserved and protected. This latter doctrine is based upon considerations of equity, and is intended to prevent one party from losing his own demand on account of the insolvency of his immediate debtor, and from being at the same time compelled to pay the debt originally due from himself to that insolvent. These three rules existed prior to the Codes, and have not been changed by the provisions of the statute under consideration.'' And in Section 166 he says: "Notice may be required to cut off other defenses; but a set-off, according to the accepted rule, must exist in the form of a debt then due and payable to the debtor at the date of the transfer.''

Inspection of the statutes makes it evident that notice to the debtor of the transfer of his debt is not necessary to pre-

vent the successful interposition, as a set-off at law against such debt, of a claim against the assignor which was not due and payable at the time of transfer and the authority of adjudged cases is in affirmance of this doctrine, although in some jurisdiction a contrary rule is announced.

It is to be remarked, in passing, that while we speak of "set-off" as a defense, this use of the word is neither technically correct nor warranted by Sections 690, 691 and 692, *supra*, which include within the definition of "counterclaim" that which was formerly "set-off," and which provide for "defenses" as contradistinguished from "counterclaims." (*Babcock* v. *Maxwell*, 21 Mont. 507, 54 Pac. 943.) We venture to use "set-off," and to speak of it as a defense, because in Section 571 it is so used; and also because the ultimate natural effect of allowing the deposits as a counterclaim against the note in the hands of the Butte bank would be set-off, since the deposits owing by the assignor to plaintiffs could be used only defensively, as against the assignee, to diminish or defeat recovery by it, and not as a basis for a money judgment.

No new dealings were had or agreements made, between plaintiffs and the Helena bank after the assignment of the note and before notice thereof; and this opinion is not to be construed as denying the right to interpose any defense which might have vested in plaintiffs consequent upon satisfaction, by payment to the Helena bank or otherwise, of the note, in whole or in part, before notice of assignment or which might have resulted from the execution or partial performance by plaintiffs, prior to such notice, of a contract with the Helena bank for a set-off of the deposits against the note.

We hold then, that by the indorsement of July 18th, the right to recover the amount of the note upon maturity was transferred to the Butte bank, subject only to such claims as the makers might at that time have been allowed to set off at law or in equity, against the Helena bank; in other words, the claim of plaintiffs is not a set-off against the assignee for value, unless it could have been properly asserted as such

against the assignor while the note belonged to the latter. The Butte bank took the note subject to any right of set-off which plaintiffs may have had against the Helena bank at the time of the indorsement.    We shall ignore, for the present at least, the fact that the three certificates represent deposits to the credit of the several members of the firm and regard them as debts owing by the Helena bank to Stadler & Kaufman. Under Sections 691 and 692, and at law, there can be no set-off of one debt against another unless both were due and payable before the transfer of either to a third person.    (*Coffin* v. *McLean*, 80 N. Y. 560; *Munger* v. *Albany City National Bank, supra.*)    The note was transferred July 18th and fell due September 16th.    Its immaturity when indorsed prevented the deposits, whether due or not, from being a legal set off.

Did plaintiffs on July 18th have the right in equity to set off the deposits against the note?    They maintain they did upon three grounds which, as we understand them, may be epitomized as follows:    (1) That there was an agreement or understanding between the Helena bank and themselves that, in the event the funds wherewith to pay the note at maturity were not received from a certain source, the certificates of deposit might be used for that purpose; (2) that the Helena bank lent the $6,000 to plaintiffs because of their deposits, to which all parties trusted as a means of payment—thus presenting a case of mutual credit; and (3) that the Helena bank was insolvent on July 18th and that all the deposits were then due and payable.

Disposition of the first two contentions is readily made. Finding 27 of the trial court is that the loan to plaintiffs upon the note was not made by the Helena bank upon the credit of their deposits, nor upon any agreement or understanding that the note should be paid out of the certificates of deposit.    This finding negatives the theory of a mutual credit with respect to all the deposits, including the one subject to check and sets at rest the controversy as to whether there was an understanding for a set-off of the other deposits against the note.    This

finding is consistent with the other findings, is justified by the evidence and must stand.    With respect to the absence of a finding upon the issue whether there was such an agreement or understanding as to the deposit subject to check, it is sufficient to say that the evidence does not tend to prove there was.

We come now to the third ground maintained by plaintiffs. If that should be held tenable, but not otherwise, examination of the asserted right to set off against a partnership debt the several debts owing to the partners individually will become necessary.    Were the deposits due July 18th, and was the First National bank of Helena then "insolvent," within the meaning of that word appropriate to the state of facts shown? If both conditions existed on July 18th, plaintiffs were then possessed of an equitable right to set off the deposits against the underdue note. (*Richards* v. *La Tourette*, 119 N. Y. 54, 23 N. E. 521; *Hughitt* v. *Hayes*, 136 N. Y. 163, 32 N. E. 706; *Spaulding* v. *Backus*, 122 Mass. 557; *Mercer* v. *Dyer*, 15 Mont. 317, 39 Pac. 314; *Yardley* v. *Clothier*, 2 C. C. A. 349, 51 Fed. 506; *Huse* v. *Ames*, *supra; Fuller* v. *Steiglitz*, *supra; Kinsey* v. *Ring*, *supra; Fera* v. *Wickham*, *supra;* Pom. Code Rem. Sec. 163.)    In Section 164 of the work last cited it is said, with reference to the maturity of claims: "Such a present indebtedness is indispensable, whether the case is to be governed by the ordinary rule, or whether the equitable doctrine based upon the assignor's insolvency is relied upon."

The two certificates of deposit, for $5,000 each, were payable, upon presentation, on and after November 6, 1896; so neither of them could have been allowed as set-off on July 18th, even if the Helena bank were then insolvent, and they were rightly rejected.    The action of the District Court in permitting a set-off of the open deposit of $413.37 subject to check, and in disallowing the deposit of $4,240, payable on and after July 8th, upon return of the certificate, remains to be considered.    By a deposit (other than special) in a bank, the money becomes the property of the bank, the relation of

debtor and creditor is created (Civil Code, Sec. 2540), and a contract is implied that an equivalent sum of money shall be paid to the depositor upon demand therefor (Civil Code, Sec. 2451.) The demand is for the benefit or protection of the bank. A cause of action does not exist against the depositary until and unless a wrong, to wit, a breach of the contract, is committed. In the absence of fraud, no cause of action exists or right of action arises in favor of the depositor until demand and refusal, unless some act of the bank has waived the necessity for demand. (*Downes* v. *Phœnix Bank*, 6 Hill 297; *Payne* v. *Gardiner*, 29 N. Y. 146; Morse on Banks and Banking, Sec. 322, and cases there cited.) Certificates of deposit are governed by the same rule. (*Seymour* v. *Dunham*, 24 Hun. 93; *Pardee* v. *Fish*, 60 N. Y. 265; *Munger* v. *Albany City National Bank*, *supra*.) Neither the amount of the open deposit nor of the certificate was demanded prior to September 4th; if the deposits were due July 18th, such maturity must have resulted from some act of the Helena bank, waiving demand of the one and presentation of the other. The effect of the suspension and declared insolvency of the Helena bank on September 4th, when the Comptroller took charge, was to make these two deposits due and actionable, and, had the Helena bank then owned the $6,000 note, the deposits would have become instantly mature equitable set-offs against it; under such circumstances, a demand or presentation would necessarily be waived, since to make it would be an idle ceremony, not requisite for the protection of the bank, which was unable to comply therewith. (*Chemical National Bank* v. *Bailey*, Fed. Cas. No. 2,635; *Laybourn* v. *Seymour*, 53 Minn. 105, 54 N. W. 941; *Scott* v. *Armstrong*, 146 U. S. 499, 13 Sup. Ct. 148; Morse on Banks and Banking, Sec. 322, and cases cited hereinbefore.) The court found, upon sufficient evidence, that if the Helena bank had been closed, and its business settled, on July 18, 1896, the amount that could have been realized from its assets would have been less than its liabilities at that time; that on July 18th, and thereafter, until September 4th, it was unable, from its own means, to pay

its debts as they matured, but that it did during such period actually meet and pay its obligations as they became due, in the ordinary course of business. "Insolvency" has two meanings. In its popular sense, it signifies that condition of a person whose entire assets are insufficient to pay his debts in full. The term is, however, used, in a restricted sense, to express the present inability of a trader to pay his current obligations as they mature, in the usual course of business. (*Hayden* v. *Chemical National Bank*, 28 C. C. A, 548, 84 Fed. 874; Bouv. Law Dict. tit. "Insolvency;" Standard Dict. tit. "Insolvency;" *Buchanan* v. *Smith*, 16 Wall. 277; *Case* v. *Citizens' Bank*, Fed. Cas. No. 2,489; 2 Kent, Comm. *389, note *b*; Gluck & Becker on Receivers of Corp. p. 47.) "It is in the latter sense that the term is used when traders and merchants are said to be insolvent, and, as applied to them, it is the sense intended by the [Bankruptcy] Act of Congress," (*Toof* v. *Martin*, 13 Wall. 40), and it has the same meaning, as applied to national banks, when used in the Currency Act. (*Case* v. *Citizens' Bank, supra; Market Nat. Bank* v. *Pacific Nat. Bank*, 30 Hun. 50.) The test of "a trader's insolvency is inability to pay his debts in the ordinary course, not inability to raise the money for them in the ordinary course." (*Peabody* v. *Knapp*, 153 Mass. 242, 26 N. E. 696.) In the popular sense of the word, and for some purposes, perhaps, in fact, the Helena bank was insolvent on July 18th; but in the appropriate sense it was solvent, for it then had the present ability to pay, and paid, all its obligations as they matured, in the ordinary course of business. The National Bank Act seems strongly to imply that, so long as an association is carrying on its business and meeting its obligations as they mature, whatever its actual condition as to future ability may be, it is, in the absence of fraud, not to be deemed insolvent, as between itself and its customers; and that it does not become so until, at the least, it commits an act of insolvency, and probably not until it suspends payment or is closed by the government. (See Rev. St. U. S. Secs. 5234, 5239, 5242, and Sec. 1 of Chapter 156 (St. June 30, 1876), 1 Supp. to

Rev. St. U. S.) If on July 18th, and immediately before the transfer, plaintiffs, being willing so to anticipate the payment of the note, had sought the aid of a court to set off the deposits against the note then held by the Helena bank, upon the ground that its liabilities exceeded its assets, and that although it was meeting its obligations, it was not doing so from its own means, would not the application have been denied for the reason that, since the bank was open, transacting business, and paying all its debts as they fell due, it was then solvent, and the deposits would presumptively be forthcoming on request, and that its possible, or even probable, inability, at some future day, to continue operations, did not concern plaintiffs, and constituted no waiver of, and furnished no excuse for omitting, the demand ordinarily prerequisite to the maturity of deposits? Would the court in such suit stop to investigate the source from which the means of present payment were derived, or to inquire into and determine whether or not the Helena bank, if closed on July 18th, could have liquidated in full? We are inclined to the opinion that the right of a depositor to set off his debt to such bank against the debt of the bank to him must, in the absence of fraud, be ascertained and determined by reference to the state and condition of the opposing demands at the time of declared insolvency, and we are satisfied that the policy of the law leads to this conclusion. Considerations of expediency suggest that the contrary view would open the way for evils innumerable. If it be that on July 18th assets and liabilities might have been compared, the one with the other, in order to determine the solvency or insolvency of the bank at that time, by parity of reason the inquiry might be pursued indefinitely, and extend to any day, however distant, in the past. The solvency of a bank on any given day would depend, in most cases, upon the inferences which the individual judge or jury might draw from expert and other evidence respecting the amount and value of its assets (among which are included the financial worth and moral integrity of its debtors) and the extent of its liabilities; and different courts would not be unlikely to reach

opposite results, even upon the same evidence, especially were it conflicting, and the questions reasonably susceptible of either solution,—one court adjudging the bank's solvency, and rejecting a set-off, and the other its insolvency, and allowing a set-off, and both decisions referring to its condition on the same day. To permit this would inject additional uncertainty and confusion into the inexact science of law and into the art of practicing it. The cases cited by plaintiffs in their able and exhaustive argument upon the subject do not militate against the views we entertain. They treat of the right of equitable set-off consequent upon, and growing out of, a trader's declared insolvency; and we have been unable, after diligent search, to find any persuasive authority to the effect that mere excess of liabilities over assets makes a trader insolvent so as to clothe his debtor with such equity, whatever may be its effect otherwise. Nor do Sections 3971 and 4511 of the Civil Code control, for they merely define the circumstances in which the consignee of goods stopped in transit and the person who makes an assignment for the benefit of his creditors are insolvent within the meaning of Chapter V, and of Title III of Part II, Div. IV, entitled "Stoppage in Transit," and "Assignment for the Benefit of Creditors," respectively.

It follows that the action of the court in disallowing the two certificates of deposit for $5,000 each and the certificate for $4,240 as set-offs was correct, but that in allowing the deposit of $413.37 the court erred; in short, that the First National Bank of Butte is entitled to recover upon the note, and that plaintiffs are not entitled to any set-off against it. That part of the judgment appealed from by the bank will therefore be reversed, and the cause remanded, with direction to the court below to modify the judgment so that it shall conform to the views expressed in this opinion, and to enter it as modified; and it is so ordered.

*Modified.*

BRANTLY, C. J., and HUNT, J., concur.